891 So.2d 1096 (2004)
John FEAGLE and Avian Feagle, Appellant,
v.
Estate of Chester Arthur PURVIS, Jr., Appellee.
No. 5D03-3466.
District Court of Appeal of Florida, Fifth District.
December 23, 2004.
Rehearing Denied January 31, 2005.
*1097 Raymond N. Seaford of Law Office of Ken Ward, P.A., Tampa, for Appellant.
Hinda Klein of Conroy, Simberg, Ganon, Krevans & Abel, P.A., Hollywood, for Appellee.
*1098 MONACO, J.
This is an appeal arising out of a personal injury action seeking damages for injuries sustained by a spectator while watching an unsanctioned airboat race on Lake Kissimmee. The appellants, John Feagle and Avian Feagle, seek review of a final summary judgment rendered by the trial court in favor of the appellee, the Estate of Chester Arthur Purvis, Jr. Because there are factual issues in this case associated with the issue of foreseeability that remain to be determined, we reverse.
The facts in this case, stated from the point of view of the plaintiff/appellant,[1] while tragic, are not difficult to understand. Mr. Feagle was standing on a sandbar in Lake Kissimmee watching airboat races that were being run. Mr. Purvis, the decedent, who was 67 years old at the time, had just finished a race, and was turning his boat around to race again. In the midst of the turn, Mr. Purvis slumped over and the vessel headed toward the sandbar. When the airboat hit the sandbar, Mr. Purvis' body shifted forward onto the gas pedal, causing the vessel to accelerate, jump the sandbar, and strike Mr. Feagle on his legs with devastating force. Mr. Feagle suffered compound fractures to one hand, both legs, and his ribs, as well as internal and neurological injuries, resulting in six surgeries to his limbs, including an amputation.
Mr. Purvis could not be resuscitated, and died at the scene. An autopsy performed on Mr. Purvis revealed that in the opinion of the Medical Examiner, he died of atherosclerotic heart disease.
Mr. Feagle and his wife, Avian Feagle, filed suit seeking damages for negligence against the Estate of Chester Arthur Purvis, and the Estate defended on a number of grounds, including the affirmative defense of sudden and unexpected incapacitation or loss of consciousness. The discovery in this case included the deposition of Dr. Mitchell, who was the personal physician of Mr. Purvis; Dr. Nelson, who was the Medical Examiner; and Dr. Nocero, who was retained by the defense as an expert medical witness. The Estate moved for summary judgment based on its affirmative defense. The trial court granted summary judgment in favor of the Estate, saying that there was insufficient evidence of foreseeability to submit the matter to a jury. Mr. and Mrs. Feagle appeal.

I. Summary Judgment and Standard of Review.

The party seeking summary judgment has the burden to demonstrate conclusively that there is no genuine issue as to any material fact, and that the movant is entitled to a judgment as a matter of law. See Fla. R. Civ. P. 1.510(c). A summary judgment should not be granted, of course, unless the facts are so clear, crystallized, and undisputed that only questions of law remain. See Dade County School Bd. v. Radio Station WQBA, 731 So.2d 638, 643 (Fla.1999); Rodriguez v. Saenz, 866 So.2d 184 (Fla. 5th DCA 2004). Thus, when considering fact-intensive negligence cases, summary judgments should only be granted with caution. See Cheeks v. Dorsey, 846 So.2d 1169 (Fla. 4th DCA 2003). An appellate court reviews the grant of a summary judgment de novo. See Krol v. City of Orlando, 778 So.2d 490, 491 (Fla. 5th DCA 2001).

II. Sudden and Unexpected Loss of Capacity or Consciousness Defense.

As a general rule, the operator of an automobile, vessel or other mode of transportation who unexpectedly loses consciousness or becomes incapacitated is not *1099 chargeable with negligence as a result of his or her loss of control. See Baker v. Hausman, 68 So.2d 572 (Fla.1953); Wingate v. United Servs. Auto. Assn., 480 So.2d 665 (Fla. 5th DCA 1986); see also Travers, Annotation, Liability for Automobile Accident Allegedly Caused By Driver's Blackout, Sudden Unconsciousness, or the Like, 93 A.L.R.3d 326 (1979). The cases considering the subject suggest that in order to establish the defense of sudden and unexpected loss of capacity or consciousness, the defendant must prove the following:
1. The defendant suffered a loss of consciousness or capacity. See, e.g., Bridges v. Speer, 79 So.2d 679, 681 (Fla.1955); Wilson v. The Krystal Co., 844 So.2d 827 (Fla. 5th DCA 2003).
2. The loss of consciousness or capacity occurred before the defendant's purportedly negligent conduct. See Malcolm v. Patrick, 147 So.2d 188, 193 (Fla. 2d DCA 1962).
3. The loss of consciousness was sudden. See, e.g., Baker v. Hausman, 68 So.2d 572, 573 (Fla.1953); Malcolm.

4. The loss of consciousness or capacity was neither foreseen, nor foreseeable. See, e.g., Baker; Wilson; Wingate; Malcolm.

Whether the defense of sudden and unexpected loss of capacity or consciousness is available, generally boils down to a question of foreseeability Foreseeability, however, relates to both the negligence elements of duty and proximate causation, but does so in different ways. As the Florida Supreme Court noted in McCain v. Florida Power Corp., 593 So.2d 500 (Fla.1992), the duty element focuses on whether the conduct of the defendant foreseeably created a broader "zone of risk" that posed a general threat of harm to others, while the proximate causation element concerns whether and to what extent that conduct foreseeably and substantially caused the specific injury to the plaintiff. The court said further:
[Duty] is a minimal threshold legal requirement for opening the courthouse doors, whereas [proximate causation] is part of the much more specific factual requirement that must be proved to win the case once the courthouse doors are open.
Id. at 502. The duty of care is generally a question of law. See McCain, 593 So.2d at 501. Cases involving sudden and unexpected loss of capacity, however, most often concern the foreseeability associated with proximate causation, and causation is generally a question of fact. See Cheeks, 846 So.2d at 1171.
Because foreseeability is the foundation for establishing the incapacity or loss of consciousness of the defendant, the defense would not be sustainable if the defendant was aware of facts sufficient to cause a reasonably prudent person to anticipate that he or she might lose consciousness or become incapacitated, and that driving or operating an automobile or vessel under the circumstances would likely result in an accident. Accordingly, one seeking to defend on this basis must show not only that there was a sudden physical or mental incapacity, but also that the incapacity was "unanticipatable and unforeseen." See Malcolm, 147 So.2d at 193.

III. Application of the Law To The Facts.

The facts before us, considered from the point of view of the plaintiff, center primarily upon the physical condition of Mr. Purvis at the time of the accident. Mr. Purvis had been seeing a heart specialist, Dr. Mitchell, for about five years prior to the accident, and had been diagnosed with and treated for coronary artery *1100 disease. Periodic stress tests and electrocardiograms confirmed the presence of the disease, but not the degree to which his arteries were blocked. On six occasions over the course of years Dr. Mitchell urged Mr. Purvis to allow a cardiac catherization to be performed on him so that the full extent and location of the disease could be measured. Mr. Purvis, as was certainly his right, declined to allow the procedure to be performed because he considered it to pose significant risks, and because, as his wife said, he was "petrified of being cut on." Mr. Purvis was compliant in all other ways with his doctor, and willingly took the medications prescribed for him, and underwent other suggested non-invasive tests.
During the five years that Dr. Mitchell regularly saw Mr. Purvis, the doctor continued to express concern about the risk of a heart attack, and the need for a cardiac catherization. About a year before the accident, in fact, one of Dr. Mitchell's notes read, "He understands that there is risk of myocardial infarction and is willing to take that risk." Dr. Mitchell, however, placed no restrictions on Mr. Purvis with respect to driving a vehicle or operating his airboat.
After Mr. Purvis died, the Medical Examiner, Dr. Nelson, performed an autopsy on him. The Medical Examiner's report indicated that the cause of death was atherosclerotic heart disease, which is consistent with Dr. Mitchell's diagnosis. Dr. Nelson opined that Mr. Purvis suffered from atherosclerosis (hardening of the arteries), and an enlarged heart. He discovered, as well, an area of myocardial fibrosis (dead heart muscle tissue), in his left ventricle, indicating that Mr. Purvis had suffered a heart attack in the past. He testified that the most likely mechanism of death was cardiac arrythmia (absence of a heartbeat), or fibrillation, but he was unable to say whether Mr. Purvis knew at the time of the accident that his death or a cardiac event was imminent. Cardiac arrythmia, according to Dr. Nelson, could be a sudden event, but as to Mr. Purvis, it was only a supposition.
As part of its defense, the Estate retained Dr. Nocero as a medical expert in cardiology. Dr. Nocero confirmed that Mr. Purvis had chronic coronary artery disease (i.e., atherosclerotic heart disease), and suffered from angina. He found from studying the medical charts, autopsy report, and depositions of Dr. Nelson and Dr. Mitchell that two of Mr. Purvis' arteries were "99% occluded." He found, as well that Mr. Purvis had suffered at least one prior heart attack, and perhaps more, and he described Mr. Purvis as a "high-risk coronary artery disease patient." He noted that if a patient is designated as such, it is foreseeable that the patient might be subject to acute cardiac sudden death syndrome. Although the full extent of Mr. Purvis' heart disease was not known until the autopsy was completed, Dr. Nocero testified that Mr. Purvis and his physician would have had all this information if Mr. Purvis had allowed the heart catherization to be performed.
In his opinion the cause of the death was acute cardiac sudden death syndrome due to the underlying chronic artery disease. On the specific subject of whether Mr. Purvis suffered a loss of consciousness on the day of the accident, Dr. Nocero testified that it would depend largely on what kind of arrythmia or irregular heart rhythm led to sudden cardiac death. He related that in acute cardiac sudden death syndrome, the death occurs within an hour of the onset of the attack. More specifically, he testified:
If it's ventricular tachycardia, where the heart does beat, albeit rapidly two hundred and twenty times a minute, the patient can stay conscious for many seconds, *1101 but unfortunately, ventricular tachycardia devoludes into ventricular fibrillation which is complete chaotic rhythm and that leads to loss of consciousness in a matter of seconds mostly because there's no effective forward flow of the blood.
He then indicated that he had no opinion regarding whether Mr. Purvis suffered a loss of consciousness before impact, and said that it was possible for a person suffering an acute cardiac sudden death syndrome to be rendered physically incapacitated, although not unconscious.
Beyond the medical testimony, it is important to our consideration that Mr. Purvis was operating an airboat at the time of his accident and demise. This is of significance because Section 327.32, Florida Statutes (2002), entitled "Vessel declared dangerous instrumentality; civil liability," reads:
All vessels, of whatever classification, shall be considered dangerous instrumentalities in this state, and any operator of a vessel shall, during any utilization of the vessel, exercise the highest degree of care in order to prevent injuries to others.
Accordingly, the standard of care imposed on operators of vessels by this statute is greater than the duty to use reasonable care ordinarily imposed in negligence cases. See Bradley v. Guy, 438 So.2d 854 (Fla. 5th DCA 1983). Thus, the summary judgment bar was set a little higher for the Estate.
It is now our task to sift all of these matters through the concept of foreseeability. More specifically, we must inquire into whether there are any disputed issues of fact on the subject of whether Mr. Purvis suddenly lost consciousness or capacity, and, if so, whether that loss was "unanticipatable and unforeseen." See Malcolm v. Patrick, 147 So.2d at 193.
In connection with the issue of whether Mr. Purvis suddenly lost consciousness or the capacity to act, we are troubled by certain parts of the medical testimony that appears to be ambiguous. The testimony of Dr. Nocero, for example, suggests that Mr. Purvis either may have died instantaneously and without time to react; or that he may have had sufficient time to take precautionary action; or that he had been rendered incapacitated, but not unconscious at the time of the accident. While there is certainly a strong suggestion that Mr. Purvis may have suffered a "sudden" death, this does not eliminate the foreseeability issue if "sudden" is defined, as Dr. Nocero did, as being up to an hour before death. The evidence thus far adduced simply does eliminate this critical factual consideration.
Turning now to whether any such sudden loss of consciousness or capacity was unanticipatable, and unforeseen, we know on the one hand that Mr. Purvis had operated an airboat for many years, and that it was one of his pleasures. On the other hand, however, Dr. Nocero related that racing airboats could result in increased stress or excitement. We know, as well, that at the time of his death, Mr. Purvis, was participating in an unsanctioned, and arguably unlawful, racing event, and was not in good health. He had endured at least one prior heart attack of which he might or might not have been fully knowledgeable, suffered from angina over a long course of years, and was unquestionably aware that he had a serious heart condition. Despite these serious health issues, and despite the statutory requirement that he exercise the "highest degree of care" while operating his boat, he still chose to participate in this event.
Similarly, the testimony makes clear that Mr. Purvis had operated his airboat for years, and had no medical restrictions *1102 placed on him in that regard. We know, in addition, that Mr. Purvis was most probably not aware of the full extent of his disease. From the perspective of foreseeability, however, it appears that his lack of awareness was a result of his refusal to have a diagnostic test that would have described it in substantial detail to his physicians. While he was certainly entitled to refuse the invasive procedure that was repeatedly suggested to him, and we do not mean to suggest otherwise, this is unquestionably another matter that must be plugged into the foreseeability analysis for summary judgment purposes, particularly as it involves whether any loss of capacity was "unanticipatable".
When these disparate, but reasonable factual considerations are measured against the admonition that summary judgment should only cautiously be granted in negligence cases, we conclude that the trial court erred in entering a summary judgment for the Estate. Whether Mr. Purvis' loss of consciousness or capacity was neither foreseen, nor foreseeable, is a dispositive question that simply cannot be resolved by summary judgment based on the record before us.

IV. Conclusion.

Consider what this case is not about. It is not about directed verdicts, and it is not about what a jury might or might not find. This case is about summary judgment. The issues we are dealing with are very narrow, and we want to take pains to insure that our decision is not misinterpreted. We are not holding that just because a person is diagnosed with heart disease, he or she must automatically give up the defense of sudden loss of consciousness if that person continues to drive. We are not holding that a refusal to take a diagnostic test invariably leads to a conclusion of negligence. We do hold, however, that given the requirements of foreseeability, there remains in this particular case disputed issues of fact that preclude the issuance of a summary judgment.
REVERSED.
SAWAYA, C.J., and PETERSON, J., concur.
NOTES
[1] See Markowitz v. Helen Homes of Kendall Corp., 826 So.2d 256 (Fla.2002).